# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00393-CV

**Strata Resources, a Texas Partnership; Steven Bland Epps; and
Charles W. Brandes, Individually, Appellants**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT NO. D-1-GV-01-003566, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING

## O P I N I O N

Strata Resources and its one-time general partners, Stephen Bland Epps and Charles W. Brandes, appeal a judgment imposing administrative and civil penalties and requiring reimbursement for funds expended to plug certain wells formerly operated by Strata. They bring five issues contending that the well-plugging expenses imposed on Epps were pre-petition debts discharged in Epps's bankruptcy, that they are not liable for plugging expenses on two of the wells because the Railroad Commission acted improperly in converting these wells into water wells for the landowner's benefit, that the Commission failed to properly offset well-plugging expenses with the well equipment's salvage value, that the civil penalties imposed are not supported by the evidence, and that the attorney's fees award is not supported by the evidence. We will affirm the judgment in part, reverse and render in part, and reverse and remand in part.

## BACKGROUND

The State's claims for well-plugging reimbursement and penalties were tried to the bench, and the following summarizes the pertinent evidence presented. Epps and Brandes were Strata's sole partners. Strata was the operator on four sets of oil wells at issue in these proceedings: (1) the Salinas Lease, Well Nos. 1, 2, and 4; (2) the Oliveira Lease, Well Nos. 1, 2A, 3, and 4; (3) the Q.K. Barber Lease, Well No. 1; and (4) four wells on the Guzman or Ramirez leases. On November 24, 1997, after Strata had become the operator on the Salinas and Oliveira wells, Brandes withdrew from the partnership. However, no new form P-4 was filed after Brandes withdrew from the partnership.[1] *See* 16 Tex. Admin. Code § 3.58(a) (2007).[2] The district court concluded that Brandes had remained personally liable for maintaining the Salinas and Oliveira wells and for those leases, and appellants do not challenge those holdings.

The Commission issued an administrative order with respect to each of the four sets of wells. The first of the four orders (docket number 03-0223600) was issued September 12, 2000, and required Strata and Epps, individually, to plug the Q.K. Barber Lease, Well No. 1, and assessed

---

[1] A form P-4 is a Producer's Transportation Authority and Certificate of Compliance.

[2] For convenience, we cite to the current versions of statutes and rules except where language in the prior version affects our analysis or the outcome.

Rule 3.58(a) provides:

> The Commission form P-4 establishes the operator of an oil lease, gas well, or other well; certifies responsibility for regulatory compliance, including plugging wells in accordance with §3.14 of this title (relating to plugging); and identifies gatherers, purchasers, and purchasers' commission-assigned system codes authorized for each well or lease. Operators shall file form P-4 for new oil leases, gas wells, or other wells; recompletions; reclassifications of wells from oil to gas or gas to oil; consolidation, unitization or subdivision of oil leases; or change of gatherer, gas purchaser, gas purchaser system code, operator, field name or lease name.

2

Strata and Epps, individually, an administrative penalty of $4,000. The remaining three orders were issued November 9, 2000. One of the November 9 orders (docket number 04-0221562) involved the Guzman Lease, Well No. 12; the Ramirez Lease, Well No. 14; the Ramirez-Guzman Unit Lease, Well No. 7; and the Guzman-Ramirez Lease, Well No. 8, and assessed Strata and Epps, individually, an administrative penalty of $8,000. Another November 9 order (docket number 04-0221710) required Strata, Epps, and Brandes, individually, to plug the Salinas Lease, Well Nos. 1, 2, and 4. The order also assessed an administrative penalty against all three appellants, individually, in the amount of $6,000. In its final November 9 order (docket number 04-0221711), the Commission required Strata, Epps, and Brandes, individually, to plug the Oliveira Lease, Well Nos. 1, 2A, 3, and 4, and assessed an administrative penalty in the amount of $8,000. Each of the orders gave appellants thirty days to comply with its terms. Appellants neither filed motions for rehearing nor complied with any of the four orders.

After issuing these orders, the Commission approached the owner of the land on which the Salinas No. 4 and Oliveira No. 4 were located. At the request of the landowner, the Commission took over and reconditioned these wells and converted them into water wells. Epps testified that he was not notified of the Commission's action with respect to these wells.

On October 18, 2001, the State brought suit against Strata, Epps, and Brandes under the natural resources code to enforce its orders. *See* Tex. Nat. Res. Code Ann. § 89.043(a) (West Supp. 2007). The State sought administrative and civil penalties for failure to comply with the orders to plug abandoned wells. The State also sought reimbursement for well-plugging costs, prejudgment interest, attorney's fees, and court costs. In addition, the State asked the trial court for

3

an injunction requiring appellants to plug their remaining wells or otherwise bring those wells into compliance with Commission rules.

On August 3, 2003, while the suit was pending, Epps filed for Chapter 13 bankruptcy. According to Epps, the Commission was given notice of the bankruptcy, appeared at the hearing, and filed a claim for administrative penalties. On September 10, 2004, Epps's case was converted from a Chapter 13 bankruptcy case to a Chapter 7 bankruptcy case. Epps was discharged from Chapter 7 bankruptcy on December 27, 2004.

On December 15, 2005, following Epps's discharge from bankruptcy, the district court heard evidence and arguments in the case. Following trial, the court rendered judgment imposing $14,000 in administrative penalties, $10,000 in civil penalties, and $36,863.20 in reasonable plugging expenses jointly and severally from Strata, Epps, and Brandes. This portion of the judgment reflected penalties and reimbursement expenses imposed regarding the Salinas and Oliveira wells.[3] Strata, Epps, and Brandes were also ordered, jointly and severally, to plug the Oliveira No. 3. The district court also imposed $12,000 in administrative penalties and $10,000 in civil penalties jointly and severally from Strata and Epps in connection with the remaining two sets of wells and enjoined Strata and Epps, jointly and severally, to plug the Q.K. Barber Well No. 1, according to Commission rules. In addition, the court ordered that the State recover attorney's fees in the amount of $7,500 and court costs in the amount of $343 jointly and severally from all appellants.

---

[3] These amounts, according to the district court's subsequent findings of fact and conclusions of law, represented $17,705.70 in plugging expenses, $6,000 in administrative penalties, and $5,000 in civil penalties related to the Salinas wells; and $19,157.50 in plugging expenses, $8,000 in administrative penalties, and $5,000 in civil penalties related to the Oliveira wells.

4

The district court subsequently made findings of fact and conclusions of law. Strata, Epps, and Brandes appealed.

## DISCUSSION

**Plugging cost reimbursement**

In their first issue, appellants argue that the cost of plugging the wells was a pre-petition debt that was discharged by Epps's discharge from Chapter 7 bankruptcy. The State disagrees. Additionally, the State brings a cross-point in which it urges that the plugging cost reimbursement debt was not discharged in bankruptcy because the Commission had no notice of the bankruptcy.

While Strata, Epps, and Brandes argue this issue collectively, only Epps filed for bankruptcy and raised the affirmative defense of discharge. We also note that Epps's argument regarding discharge is limited to his liability for plugging costs, not the administrative or civil penalties. Consequently, this issue concerns only Epps's liability for plugging-cost reimbursement.

### *Discharge of pre-petition debt*

Under the bankruptcy code, whether a claim for payment of the type at issue in this case is discharged depends on when that claim arose. The bankruptcy code defines a "claim" as a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C.A. § 101(5) (West Supp. 2008). As the statute explicitly states, whether a claim is unliquidated, contingent, unmatured, or unsecured is immaterial. The bankruptcy code requires only that the elements giving rise to liability occurred before the bankruptcy petition was filed.

Congress intended a broad construction of the term "claim" to permit the broadest possible relief in bankruptcy court. *Johnson v. Home State Bank*, 501 U.S. 78, 83-86 (1991); *In re National Gypsum*, 139 B.R. 397, 405 (Bankr. N.D. Tex. 1992). As the *National Gypsum* court observed:

> The legislative history of the Code reflects Congress' intent that the term "claim" be given broad interpretation so that all legal obligations of the debtor, no matter how remote or contingent will be able to be dealt with in the bankruptcy case. The courts accordingly have given a broad and expansive reading to the term "claim."

*National Gypsum*, 139 B.R. at 405 (internal citations omitted). Thus, courts must look to the earliest possible date upon which a claim may arise, so as to maximize the scope of a discharge. *Id.* at 404-09.

Whether a claim is a pre-petition claim requires an examination of the underlying substantive law. *Id.* at 405. At issue here are provisions of the natural resources code governing the plugging and replugging of oil and gas wells. The legislature authorized the Commission to plug or replug oil and gas wells in certain circumstances:

(a)     If the commission determines at a hearing under Section 89.041 of this code that a well has not been properly plugged or needs replugging, the commission, through its employees or through a person acting as agent for the commission, may plug or replug the well if:

6

(1) the well was properly plugged according to rules in effect at the time the well was abandoned or ceased to be operated; or

(2) neither the operator nor nonoperator properly plugged the well, and

    (A) neither the operator nor nonoperator can be found; or

    (B) neither the operator nor nonoperator has assets with which to properly plug the well.

Tex. Nat. Res. Code Ann. § 89.043(a). After the Commission plugs or replugs a well under section 89.043(a), the Commission may order the operator to reimburse plugging costs and may enforce its order by filing suit, and:

(3) if the commission plugs the well, the commission:

    (A) by order may require the operator to reimburse the commission for the plugging costs; or

    (B) may request the attorney general to file suit against the operator to recover those costs;

*Id.* § 89.043(c)(3). Thus, it is only after the Commission plugs a well that the Commission may order reimbursement for plugging costs from the well operator. In other words, the cause of action is not ripe until the Commission actually plugs the well. *See id.* § 89.083(f) (West Supp. 2007) ("*If the commission plugs a well under Sections 89.043 through 89.044 of this code, the state has a cause of action for all reasonable expenses incurred in plugging or replugging the well and not recovered under Section 89.085 of this code or through reimbursement to the commission.*") (emphasis added).

Epps argues that, under the natural resources code, even if the State's reimbursement claim was not ripe before Epps filed his bankruptcy petition, the State's contingent claim arose for

7

bankruptcy purposes when Strata failed to comply with the Commission's plugging orders, thirty days after the orders were issued. To support its argument, Epps relies chiefly on *National Gypsum*. 139 B.R. 397. The issue in *National Gypsum* was whether future environmental response and resource damage costs under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)[4] were "claims" within the meaning of the bankruptcy code. *Id.* at 403. According to the court, "[a] claim exists only if before filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all the elements necessary to give rise to a legal obligation—'a right to payment'—under the relevant non-bankruptcy law." *Id.* at 405. Even if the claims under the applicable statutory provisions are not yet ripe for adjudication at the time the bankruptcy petition is filed, as long as "all the elements that can give rise to liability" have occurred pre-petition, the claim is a pre-petition claim that is discharged in bankruptcy. *Id.*

Similar to the claims at issue here, the CERCLA claims in *National Gypsum* were not ripe until after the cleanup. "Liability is not assessed until after the EPA has investigated a site, decided what remedial measures are necessary, and determined which potentially responsible persons will bear the costs." *Id.* (quoting *In re Combustion Equip. Assoc., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988)). Although the amount of the claim may be unknown pre-petition, in light of an underlying statutory scheme in which speedy remediation is promoted by requiring cleanup before suit can be brought for reimbursement and in light of Congress's intent that the term "claim" be given a broad interpretation, the court ultimately held that "all future response and natural resource

---

[4] Under CERCLA, private parties that incur costs in cleaning up hazardous substances may bring suit against certain statutorily defined responsible parties to recoup those costs. 42 U.S.C.A. § 9607(a)(4)(B) (West 2005).

damages costs based on pre-petition conduct that can be fairly contemplated by the parties at the time of Debtors' bankruptcy are claims under the Code." *Id.* at 409.

Other cases interpreting the interplay between environmental cleanup statutes and the bankruptcy code also support Epps's position. For example, addressing the interplay between the bankruptcy code and CERCLA, some courts have applied a foreseeability analysis to determine at what point CERCLA claims arose or were contingent. *See, e.g.*, *In re Chicago, Milwaukee, St. Paul & Pac. R.R., Co.*, 974 F.2d 775 (7th Cir. 1992); *Mesiti v. Microdot, Inc.*, 156 B.R. 113 (Bankr. N.H. 1993). A claim was foreseeable under CERCLA, for example, where parties knew that the hazardous substance had been released, that response costs would be incurred, that such a hazardous release likely fell within the purview of CERCLA, and that derailment of the debtor's train had caused the hazardous release. *Chicago*, 974 F.2d at 787. Though still a contingent claim, the bankruptcy debtor could be tied to a known release of hazardous substances; therefore, the claim had arisen under CERCLA at the time of bankruptcy. *Id.* at 786.

The Fifth Circuit has employed a similar analysis in its interpretation of the interplay between the bankruptcy code and environmental statutes. For example, addressing an environmental liability claim against the debtor, the Fifth Circuit affirmed the bankruptcy court's determination that, because the claimant became aware of the hazardous release before the close of the bankruptcy case and because the claimant had information that would allow a connection to be made between the debtor and the hazardous release, the claim arose pre-petition. *In re Crystal Oil Co.*, 158 F.3d 291, 296-97 (5th Cir. 1998).

The Fifth Circuit has also adopted a similar test for non-environmental claims, interpreting the term "claim" broadly in favor of discharge. Attempting to define the scope of

9

"claim" in considering whether a claim for tort liability arose pre-petition, the court explained that "a claim arises at the time of the debtor's negligent conduct forming the basis for liability only if the claimant had some type of specific relationship with the debtor at that time." *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1276 (5th Cir. 1994). Applying this test, the court held that the tort-liability claim did not arise pre-petition because the injury occurred three years after the bankruptcy petition was filed and no pre-petition relationship had existed between the parties. *Id.* at 1277.

In another case, the Fifth Circuit reviewed certain state court claims against the claimant's ex-husband to determine whether those claims arose pre- or post-petition. *In re Egleston*, 448 F.3d 803, 812-14 (5th Cir. 2006). The state court settlement order between the parties had ordered the ex-husband to pay alimony to the ex-wife. *Id.* at 805. Six months later, the ex-husband filed for bankruptcy. *Id.* He then failed to make some of the alimony payments and was held in contempt of court. *Id.* at 806-07. Unable to pay her bills without the alimony payments, the ex-wife lost both her home and her car. *Id.* at 807. A state court again found the ex-husband in contempt and, among other things, ordered him to pay certain sums to compensate his ex-wife for her lost house and car. *Id.* Affirming the judgment of the lower courts, the Fifth Circuit held that the portions of the state court judgment at issue arose pre-petition and, therefore, represented the ex-husband's liability for discharged debt. *Id.* at 812-14. The court reasoned that the state court awards had been made to compensate the ex-wife for her loss of the house and the vehicle and that she had been unable to continue making payments as a direct result of her ex-husband's failure to make alimony payments. *Id.* at 813. The ex-husband had breached his obligation to make payments pre-petition. *Id.* In addition, foreclosure proceedings on the house had begun pre-petition, and the car

10

was "up for repossession" pre-petition. *Id.* Although the debts had not matured pre-petition, they arose pre-petition and were, therefore, discharged under the bankruptcy code's "broad definition of 'claim.'" *Id.* at 814.

The cases cited by the State to support its position that the claim did not exist at the time the bankruptcy petition was filed are unpersuasive. In one case, the issue was whether an action of the Department of Environmental Resources (DER) was an action to enforce a money judgment under section 362(b)(5) of the bankruptcy code and, therefore, an action subject to the automatic stay. *Penn Terra, Ltd. v. Department of Envtl. Res.*, 733 F.2d 267, 272 (3d Cir. 1984). Contrary to the State's interpretation, the court in *Penn Terra* determined whether the actions of the DER were an attempt to enforce a money judgment; the court did not determine whether a pre-petition order to take environmental correction actions constituted a "claim" under section 101(5). *Id.* The court concluded that the suit brought by DER was brought as an equitable action to prevent future harm, not as an action to enforce a "money judgment" because a money judgment must result in the "adjudication of liability for a sum certain." *Id.* at 275-78. Thus, according to the court, the "police powers" exception to the automatic stay provision found in section 362(b)(5) was applicable.[5]

---

[5] Section 362(b)(5) provides:

> (b)     The filing of a petition under section 301, 302, or 303 of this title does not operate as a stay
>
> > (5)     under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power

11 U.S.C.A. § 362(b)(5) (West Supp. 2008).

*Id.* at 278-79. The court did not address what constitutes a "claim" under section 101(5). *See id.* at 274-79.

In another case cited by the State, the issue was, similarly, whether the EPA's enforcement action against Commonwealth qualified as the enforcement of a money judgment under section 362(b)(5) of the bankruptcy code. *Commonwealth Oil Ref. Co. v. EPA*, 805 F.2d 1175 (5th Cir. 1986). The State correctly states the court's holding that the EPA's order was an exercise of the EPA's police or regulatory powers and not an action to enforce a money judgment; therefore, the automatic stay did not apply to the EPA's actions. This holding, however, has no application to the present case.

In the third case cited by the State to support its position, the issue was whether the automatic stay provision applied where the debtor's acts occurred pre-petition but the resulting cause of action arose post-petition. *In re M. Frenville Co.*, 744 F.2d 332, 333 (3d Cir. 1984). A&B, a certified public accounting firm, had been engaged by M. Frenville Co., Inc., as an independent auditor and accountant and, in this capacity, prepared financial statements for Frenville. Creditors of Frenville filed an involuntary petition in bankruptcy against Frenville. *Id.* Several banks also filed suit against A&B, alleging that the financial statements had been negligently and recklessly prepared. *Id.* A&B sought to include Frenville in this proceeding to obtain indemnification or contribution from Frenville for any loss suffered by A&B as a result of the banks' suit. *Id.* at 333-34. The bankruptcy judge, however, refused to lift the automatic stay, which barred A&B's action for indemnification and contribution. *Id.* at 334.

According to the court, the applicability of the automatic stay depended on whether the claim arose pre-petition or post-petition. *Id.* at 336. More specifically, the determination to be

made was at what point the claimant had a right to payment for indemnity or contribution. *Id.* Under New York law, a third-party complaint for contribution or indemnity may only be brought after the defendant (A&B) serves his answer in the suit brought by the plaintiff (the banks). *Id.* at 337. A claim for contribution or indemnification does not accrue at the time of Commission of the underlying act but at the time of payment of the judgment stemming from a claim on the underlying act. *Id.* at 337. Thus, before suit was brought by the banks, A&B had no claim or cause of action against Frenville. *Id.* at 337. A&B would only have a right to payment from the banks if A&B were found liable to the banks. *Id.* Therefore, once suit was brought by the banks, even before A&B filed its answer, A&B would have an unmatured, unliquidated, disputed claim.[6] *Id.* At the time the bankruptcy petition was filed, the banks had not filed suit; therefore, A&B had no claim against Frenville. *Id.*

Here, the State is in a position analogous to the banks in *Frenville*. It is the State that has the right to bring suit against Epps, not some other third party. The State had a right to payment thirty days after Epps failed to comply with Commission orders even though its claim had not yet been filed and was, therefore, unmatured, unliquidated, and disputed. Under section 101(5), however, even though the claim was unmatured, unliquidated, and disputed, the elements giving rise to liability occurred before the bankruptcy petition was filed. Consequently, the State's claim arose pre-petition. *See* 11 U.S.C.A. § 101(5).

---

[6] The court emphasized that, had an indemnity contract existed between the banks and A&B, A&B would have had a contingent right to payment even before the banks filed suit; however, no such contract existed in this case. *In re M. Frenville Co.*, 744 F.2d 332, 337 (3d Cir. 1984).

13

We note that all three cases cited by the State interpret the automatic stay provisions of the bankruptcy code. To the extent that those provisions apply here, they support Epps's rather than the State's position. Section 362 requires that the filing of a petition in bankruptcy operates as a stay of:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was *or could have been commenced* before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title

11 U.S.C.A. § 362(a)(1) (West Supp. 2008) (emphasis added). The automatic stay would apply to the State's claim, as the claim "could have been commenced" thirty days after Strata failed to comply with the Commission's orders of September and November 2000. Conversely, in *Frenville*, for example, the claim at issue was an action for indemnity. 744 F.2d at 335. Under New York law, the claim could not be filed until the defendant served his answer in the suit brought by the plaintiff. *Id.* The suit was not initiated by plaintiffs until fourteen months after bankruptcy was filed; therefore, the automatic stay did not apply. Here, however, the State could have plugged the wells and then filed its claim for indemnity at any time following thirty days of Strata's noncompliance with the Commission's order.

Broadly summarizing its arguments, the State asserts that "[i]n Texas, unlike other federal environmental laws, the right to payment does not come into existence when the violation occurs; rather, in Texas, the Commission's right to payment only exists if and only if the Commission plugs or replug [sic] a well." In essence, the State is arguing that the underlying

14

substantive federal and state and state environmental laws operate differently despite the similarities in procedures by which reimbursement claims arise and are filed. The State, however, cites no authority for this proposition, and the cases cited and discussed above in support of this proposition either do not apply or offer no support for the State's position.

We conclude that the State's claim arose before the bankruptcy was filed and, therefore, assuming the State had notice of the claim, the reimbursement claim against Epps should have been discharged in his bankruptcy. Accordingly, we sustain Epps's first issue.

### *Notice*

Under section 523(a)(3) of the bankruptcy code, "Exceptions to Discharge," a debtor is not discharged from any debt that is:

(3)     neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit—

    (A)     if such debt is not of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim, unless such creditor had notice or actual knowledge of the case in time for such timely filing; or

    (B)     if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dis-chargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request

11 U.S.C.A. 523(a)(3) (West Supp. 2008). Here, there is no evidence, and Strata does not assert, that the plugging expenses reimbursement claim was a listed or scheduled debt.[7] Consequently,

---

[7] Although Strata's Exhibit 5 appears to show that Strata listed the State as a creditor under the name of Ronald R. DelVento, who was the chief of the Bankruptcy and Collections Division at the Attorney General's Office, there is no evidence that any debts to the State were scheduled.

15

discharge here turns on whether the State had "notice or actual knowledge of the case in time for" timely filing of a proof of claim and timely request for a determination of dischargeability. The district court found that "[t]he Commission had notice or actual knowledge of the bankruptcy of Stephen Bland Epps."

In its cross-point, the State argues that the plugging-cost reimbursement liability could not have been discharged in Epps's bankruptcy because the evidence is insufficient to support the trial court's finding that the State had notice of the bankruptcy proceeding. In reply, Epps argues that the State had the burden of proof on this issue but failed to present any evidence to prove that it had no notice. Further, according to Epps, even if Epps had the burden of proof on the notice issue, the record contains sufficient evidence to support the court's judgment.

Discharge in bankruptcy is an affirmative defense. Tex. R. Civ. P. 94; *In re Haga*, 131 B.R. 320, 327 (Bankr. W.D. Tex. 1991); *In re Anderson*, 72 B.R. 495, 496 (Bankr. Minn. 1987). The affirmative defense of discharge establishes a prima facie defense to any claim brought against the debtor for a pre-petition debt. *In re Haga*, 131 B.R. at 327. It is the debtor's burden to establish discharge, and as part of its burden, the debtor must show that the creditor had notice or actual knowledge of the case in time to file a proof of claim and request for a determination of dischargeability. *Id.*; *Walters v. Hunt*, 146 B.R. 178, 183 (Bankr. W.D. Tex. 1992). Thus, Epps has the burden of showing that the State had notice or actual knowledge of the case in time to file a proof of claim and request for determination of dischargeability.

When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it does not have the burden of proof, that party must demonstrate on appeal that there is no evidence to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d

16

55, 58 (Tex. 1983). In reviewing a no evidence point, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998). If there is more than a mere scintilla of evidence to support the finding, the evidence is legally sufficient, and we will overrule the issue. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005). When the evidence of a vital fact is "so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

The State maintains that, pursuant to section 523(a)(3), there is no evidence that it had notice of the bankruptcy proceedings. Further, even if there is evidence of notice, the State argues, there is no evidence establishing when the proceeding occurred, and it was Epps's burden to establish that the State had "notice or actual knowledge of the case in time for such timely filing and request." *See* 11 U.S.C.A. § 523(a)(3)(B). Therefore, according to the State, Epps cannot be discharged from its debt for plugging costs.

Although the State is correct that no evidence establishes when the referenced proceeding occurred and whether such proceeding occurred in time to allow the State to timely file its claim, the State conceded in its post-trial brief that it had, indeed, filed a claim in the bankruptcy proceeding initiated by Epps's August 3, 2003 bankruptcy petition:

> Plaintiff's claim for administrative penalties is nondischargeable under federal bankruptcy law. Defendant Steven Bland Epps filed for bankruptcy protection on August 3, 2003 in the United States Bankruptcy Court for the Southern District of Texas. The Commission filed a claim for $22,800.00 in administrative penalties as an unsecured nonpriority claim.

17

In so stating, the State has conceded that it had actual notice of the bankruptcy sufficient to allow it to file its claim before the deadline. *See* 11 U.S.C.A. 523(a)(3)(B).[8]

Viewing the evidence of notice in the light most favorable to the judgment, we conclude that there was sufficient evidence to support the district court's finding that the State had notice or actual knowledge of Epps's bankruptcy. *See City of Keller*, 168 S.W.3d at 829-30. Accordingly, we overrule the State's cross-point and hold that Epps's liability for plugging-expense reimbursement was discharged in his bankruptcy.

**Water-well conversions of Salinas No. 4 and Oliveira No. 4**

As Epps's liability for plugging-cost reimbursement was discharged in his bankruptcy, appellants' remaining challenges to the plugging-cost reimbursement award concern only Brandes and Strata. In their second issue, appellants argue that they should not be responsible for the plugging costs on the Salinas No. 4 and the Oliveira No 4 because the State converted the wells to water wells for the benefit of the landowner without notice to appellants. These actions, appellants maintain, violated the Commission's own rules and preclude the State from charging the cost of conversion to appellants. The State responds that, even if the Commission converted the wells to water wells without giving notice to appellants, the State's claim for plugging cost reimbursement is unaffected.

---

[8] Epps also presented some evidence of the filing of his Chapter 13 bankruptcy petition on August 3, 2003, later conversion to a Chapter 7 case on September 10, 2004, and entry of an order of discharge on December 27, 2004. When asked whether, during the bankruptcy proceeding which is shown by Exhibits 4 and 5, a representative of the Commission appeared at any of the hearings held in that proceeding, Epps responded in the affirmative. Specifically, Epps responded that Guy Grossman, the director for District 3, had attended the bankruptcy proceedings. He further testified that, to his knowledge, the Commission was "fully aware of what was going on."

18

Commission rules allow it to plug dry or inactive wells in the following circumstances:

(A)   After notice and hearing, if the well is causing or is likely to cause the pollution of surface or subsurface water or if oil, gas, or other formation fluid is leaking from the well, and:

   (i)   Neither the operator nor any other entity responsible for plugging the well can be found; or

   (ii)   Neither the operator nor any other entity responsible for plugging the well has assets with which to plug the well.

(B)   Without a hearing if the well is a delinquent inactive well and:

   (i)   the Commission has sent notice of its intention to plug the well as required by §89.043(c) of the Texas Natural Resources Code; and

   (ii)   the operator did not request a hearing within the period (not less than 10 days after receipt) specified in the notice.

(C)   Without notice or hearing, if:

   (i)   The Commission has issued a final order requiring that the operator plug the well and the order has not been complied with; or

   (ii)   The well poses an immediate threat of pollution of surface or subsurface waters or of injury to the public health and the operator has failed to timely remediate the problem.

16 Tex. Admin. Code § 3.14(b)(4) (2007). If state funds are expended for the above plugging operations, "the Commission may seek reimbursement from the operator and any other entity responsible for plugging the well." *Id.* § 3.14(b)(5). This was the basis for the plugging reimbursement claims against appellants.

Here, the Commission plugged the wells pursuant to section 3.14(b)(4)(C)(i). *See id.* § 3.14(b)(4)(C)(i). The Commission issued orders requiring that appellants bring the Salinas and

Oliveira wells into compliance or plug them. It is undisputed that appellants did not comply with these orders. Therefore, the State was authorized to plug these wells pursuant to section 3.14(b)(4)(C)(i). *See id.*

Commission rules also specify general requirements for plugging. *Id.* § 3.14(d). These rules provide that when a well is converted to a water well, the operator must plug the well up to the base of the usable quality water strata. *See id.* § 3.14(a)(4)(A). Further, Mark England, an engineering specialist for the field operation section of the Commission's oil and gas section, testified that plugging the wells by converting them into water wells cost the State less than completely plugging the wells.

The crux of appellants' argument is that while the Commission had the right to seek reimbursement for fully plugging the wells, the Commission cannot recover those costs if it plugs the well in a manner allowing it to be used as a water well—even when doing so would cost the State less than fully plugging the well, and yield the added benefit of a water well. We find no support for appellants' contention. We conclude that the Commission plugged the Salinas No. 4 and Oliveira No. 4 consistent with the requirements of sections 3.14(b)(4) and (5) of its rules. The fact that the Commission's method of plugging also provided a benefit to the landowner by converting the wells into water wells has no bearing on the State's ability to "seek reimbursement from the operator and any other entity responsible for plugging the well," and appellants cite no authority indicating otherwise. *See id.* 3.14(b)(5). Accordingly, we overrule appellants' second issue.

**Salvage of equipment**

In appellants' third issue, they argue that they are not liable for the costs of plugging the Salinas Well Nos. 1 and 2 and the Oliveira Well Nos. 1 and 2A because the State failed to prove

certain reimbursement amounts—specifically, the value of wellsite equipment that the Commission salvaged—that appellants are entitled to offset against plugging costs. The State responds that the natural resources code allows, but does not require, such an offset and that to challenge the value of the offset, appellants were required to make a claim on the oil-field cleanup fund under section 89.086 of the code. *See* Tex. Nat. Res. Code Ann. § 89.086 (West Supp. 2007).

Appellants' argument is essentially an evidentiary-sufficiency challenge:

> The State did not meet its burden of proof by a preponderance of the evidence that the plugging costs for those wells identified in State Exhibit 5, for which the trial court awarded judgment for reimbursement, complied with the requirements of § 89.083(f); that is, the plugging costs incurred by the State, less properly priced wellsite equipment sold by the Railroad Commission at the statutory value.

Appellants dispute the State's contention that wellsite equipment sold by the State to offset reimbursement costs was sold at the generally recognized market value. At trial, Epps testified as to his opinion of the generally recognized market value, which, in his view, was "greatly in excess" of the salvage price set by the Commission.

Read together, sections 89.083(f) and 89.085 of the natural resources code allow the Commission to offset reimbursement costs with proceeds from the sale of equipment:

> (f)　If the commission plugs a well under Sections 89.043 through 89.044 of this code, the state has a cause of action for all reasonable expenses incurred in plugging or replugging the well and not recovered under Section 89.085 of this code or through reimbursement to the commission.

Tex. Nat. Res. Code Ann. § 89.083(f). To the extent that the Commission decides to dispose of well equipment, section 89.085 requires it to do so "in a commercially reasonable manner" to cover plugging costs:

(a)     When the commission forecloses its lien under Section 89.083 on a delinquent inactive well, well-site equipment and any amount of hydrocarbons from the well that is stored on the lease are presumed to have been abandoned and may be disposed of by the commission in a commercially reasonable manner by either or both of the following methods:

(1)     entering into a plugging contract that provides that the person plugging or cleaning up pollution, or both, will take title to well-site equipment, hydrocarbons from the well that are stored on the lease, or hydrocarbons recovered during the plugging operation in exchange for a sum of money deducted as a credit from the contract price;  or

(2)     selling the well-site equipment, hydrocarbons from the well that are stored on the lease, or hydrocarbons recovered during the plugging operation at a public auction or a public or private sale.

*Id.* § 89.085(a) (West Supp. 2007). Further,

The commission shall dispose of well-site equipment or hydrocarbons under this section at a price or value that reflects the generally recognized market value of the equipment or hydrocarbons, with allowances for physical condition.

*Id.* § 89.085(c). According to appellants, "[t]he evidence is undisputed that the Commission disposed of wellsite equipment, State Ex. 5, but not at the price or value required by statute."[9]

---

[9] In their initial brief, appellants also argued that the Commission failed to account for all equipment. However, in their reply brief, appellants concede that "[t]he evidence is undisputed that the Commission disposed of wellsite equipment, State Ex. 5, but not at the price or value required by statute." We, therefore, address only the "price or value" for which the equipment was sold.

22

The district court concluded that "[t]he reasonableness of the amounts for which salvaged equipment was sold is irrelevant to Strata Resources, Steven Bland Epps, and Charles W. Brandes's liability for state funds spent to plug the wells in question." At trial and on appeal, the State has argued that the exclusive means of asserting rights to proceeds of well equipment sales is not section 89.083 or section 89.085, as appellants assert, but in the statutes governing claims against the oil-field cleanup fund. *See id.* § 89.086. Because such proceeds are deposited in the oil-field cleanup fund, the State maintains that the claimant must file his claim against the fund pursuant to section 89.086:

> A person with a legal or equitable ownership or security interest in well-site equipment or hydrocarbons disposed of under Section 89.085 of this code may make a claim against the oil-field cleanup fund . . . .

*Id.* § 89.086(a). In addressing such a claim, the Commission may conduct a hearing to receive evidence. *Id.* § 89.086(e). If the claimant is not satisfied with the Commission's decision on such a claim, he may appeal to the Travis County district court. *Id.* § 89.087(a) (West 2001).

As the statutory scheme for making a claim on the oil-field cleanup fund is separate and independent from the Commission's claim for reimbursement of plugging costs, we hold that the district court was correct in concluding that "[t]he reasonableness of the amounts for which salvaged equipment was sold is irrelevant." To challenge the value the Commission obtained when disposing of their wellsite equipment, appellants were required to make a claim on the oil-field cleanup fund pursuant to section 89.086. Appellants made no such claim. Accordingly, we overrule appellants' third issue.

23

**Civil Penalties**

In their fourth issue, appellants challenge the district court's judgment imposing civil penalties against them. The civil penalties were based on section 85.381 of the natural resources code:

(a) In addition to being subject to any forfeiture provided by law and to any penalty imposed by the commission for contempt for violation of its rules or orders, any person who violates the provisions of Sections 85.045 and 85.046 of this code, Title 102, Revised Civil Statutes of Texas, 1925, as amended, including provisions of this code formerly included in that title, or any rule or order of the commission promulgated under those laws is subject to a penalty of not more than:

> (1) $10,000 when the provision, rule, or order pertains to safety or the prevention or control of pollution; or
>
> (2) $1,000 when the provision, rule, or order does not pertain to safety or the prevention or control of pollution.

(b) The applicable maximum penalty may be assessed for each and every day of violation and for each and every act of violation.

Tex. Nat. Res. Code Ann. § 85.381 (West 2001). The district court imposed civil penalties of $5,000 for appellants' violations of the administrative orders regarding each of the four groups of wells at issue. Consequently, it imposed a total of $20,000 in penalties—$10,000 of which Strata, Epps and Brandes were jointly and severally liable, and another $10,000 for which only Strata and Epps were jointly and severally liable.

Appellants contend that legally and factually insufficient evidence supports the district court's civil penalties award because the court made no finding of the precise number of days for which they were in violation of each of the administrative orders.

24

It is undisputed that none of the appellants complied with any of the four orders prior to trial. Based on the date of the orders and the date of trial, the orders that implicated only Strata and Epps were violated for a total of 3,722 days, while the orders that also implicated Brandes were violated for total of 16,488 days.[10] Thus, there is evidence in the record that Brandes was in violation of Commission orders for a total of 16,488 days while Strata and Epps were in violation of Commission orders for a total of 20,210 days.

When a trial court finds one or more elements of a ground of recovery or defense, omitted elements "will be supplied by presumption in support of the judgment" if supported by the evidence. Tex. R. Civ. P. 299. The district court was authorized, based on the number of days the

---

[10] The calculations are as follows:

September 12, 2000: issued for one well, Q.K. Barber, Well No. 1, for failure to pay administrative penalty; implicates Strata and Epps; 1,890 days of violation (from the 30 days after the date of the order, September 12, 2000 to the date of trial, December 15, 2005).

November 9, 2000 order 1: issued for four wells, Guzman, Well No. 12, Ramirez, Well No. 14, Ramirez Guzman, Well No. 7, and Guzman-Ramirez, Well No. 8, for failure to pay administrative penalty; implicates Strata and Epps; these wells were brought into compliance by Strata on December 9, 1999; 1832 days of violation for failure to pay $8,000 administrative penalty (from 30 days after the date of the order, November 9, 2000 to the date of trial, December 15, 2005); 1832 days of violation for each Strata and Epps.

November 9, 2000 order 2: issued for three wells, Salinas, Wells No. 1, 2, and 4; implicates Strata, Epps, and Brandes; 1832 days of violation for each well for failure to plug or for failure to pay reimbursement costs and 1832 days for failure to pay administrative penalty (from 30 days after the date of the order, November 9, 2000 to the date of trial, December 15, 2005); 1832 times 4 equals 7,328 days of violation for each Strata, Epps, and Brandes.

November 9, 2000 order 3: issued for four wells, Oliveira, Wells No. 1, 2A, 3, and 4; implicates Strata, Epps, and Brandes; 1832 days of violation for each well for failure to plug or for failure to pay reimbursement costs and 1832 days for failure to pay administrative penalty (from 30 days after the date of the order, November 9, 2000 to the date of trial, December 15, 2005); 1832 times 5 equals 9,160 days of violation for each Strata, Epps, and Brandes.

evidence showed each appellant was in violation and the statutory per-day maximums for civil penalties, to impose civil penalties for as much as $202,100,000 for Strata and Epps and $164,880,000 for Brandes. The district court's assessment of penalties of $20,000 for Strata and Epps and $10,000 for Brandes is, thus, well within the range of its authority and the evidence.

Having found the evidence sufficient to support the trial court's award of civil penalties, we overrule appellants' fourth issue.[11]

**Attorney's fees**

In their fifth issue, appellants challenge the district court's award of $7,500 in attorney's fees, imposed jointly and severally against Strata, Epps, and Brandes. Appellants argue that there is insufficient evidence of the reasonableness or necessity of the fees. Relatedly, appellants complain that the State failed to segregate its attorney's fees incurred in prosecuting claims for which fees were recoverable from those in which fees were not recoverable.

The State presented the following evidence of its attorney's fees:

- During its four-year pendency of the case prior to trial (October 18, 2001 through December 15, 2005), seven attorneys represented the State.

- In total, State attorneys spent a total of 127 hours on the case.

- State attorneys served no discovery on appellants.

- The trial attorney, who had been practicing for one and one-half years, had a billing rate of $150 per hour.

---

[11] Our disposition of appellants' issue renders moot the State's cross-point challenging the district court's fact finding that State Exhibit 4, which contained both the administrative orders and the State's calculations of the numbers of days of violation, "does not identify the number of days of violation by Strata Resources, Steven Epps or Charles Brandes."

The State, however, did not segregate its attorney's fees between claims or defendants. The State asserted different claims against Epps and Brandes in which it could recover attorney's fees. The State could recover administrative and civil penalties against Epps in connection with all four groups of wells, but against Brandes regarding only two groups of wells. Conversely, while the State was entitled to recover well-plugging expenses against Brandes, we have held that such expenses were not recoverable against Epps.

A claimant is required to segregate attorney's fees between claims for which attorney's fees are recoverable and those for which fees are not recoverable. *Tony Gullo Motors v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). It is only when legal services advance both recoverable and unrecoverable claims that the services are so intertwined that the associated fees need not be segregated. *Id.* at 313-14. Here, the claims for civil penalties, administrative penalties, and reimbursement of well-plugging expenses were separate and distinct. To prove its claim for civil penalties, the State needed only to prove that appellants failed to comply with Commission orders. To prove its claim for reimbursement costs, however, the State needed to show that it had plugged the wells and incurred plugging costs in compliance with the natural resources code. The State was also required to address Epps's affirmative defense that his claims for reimbursement had been discharged in bankruptcy. Indeed, the record shows that most of the trial focused on the State's reimbursement claim rather than the State's claim for civil penalties. Although the claims are not necessarily "so intertwined" that they could not have been segregated, the State's fee entries include only general entries, such as "reviewing/researching file(s)" and "conferring with agency personnel." *See id.*; *Owens v. Ousey*, 241 S.W.3d 124, 134 (Tex. App.—Austin 2007, pet. denied). Based on the evidence, we cannot conclude that there is sufficient evidence that the amount of attorney's fees

for which each appellant was held jointly and severally liable—$7,500—was reasonable. We, therefore, remand to the district court to segregate and award attorney's fees based only on the State's recoverable claims against each appellant. *See Owens*, 241 S.W.3d at 134 (remanding because evidence of attorney's fees for entire case is some evidence of what amount of segregated fees should be). To this extent, we sustain appellants' fifth issue.

## CONCLUSION

We reverse the district court's judgment awarding the State reimbursement from Epps for well-plugging costs. We remand the case to the district court for further proceedings regarding the amount of attorney's fees imposed against each appellant. We otherwise affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed in part; Reversed and Rendered in part; Reversed and Remanded in part

Filed: July 11, 2008