

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00010-CV

_____

TEXAS DEPARTMENT OF TRANSPORTATION, Appellant

V.

LEONOR PADRON, INDIVIDUALLY AND AS NEXT FRIEND FOR A. L., A MINOR, AND
AS AN HEIR AND AS SURVIVING SPOUSE OF JOSE LOPEZ GARCIA, AND AS
DEPENDENT ADMINISTRATOR FOR THE ESTATE OF JOSE LOPEZ GARCIA, AND
MARISOL DELGADO AGUIRRE, Appellees

On Appeal from the 126th District Court
Travis County, Texas
Trial Court No. D-1-GN-16-005492

Before Morriss, C.J., Burgess and Stevens, JJ.
Opinion by Chief Justice Morriss

# O P I N I O N

A Travis County jury awarded $5,232,994.00 in damages for premises liability claims brought by (1) Leonor Padron, individually and as next friend for A.L., a minor; as an heir and as surviving spouse of Jose Lopez Garcia; and as dependent administrator for the Estate of Jose Lopez Garcia; (2) Marisol Delgado Aguirre; and (3) Intervenor Sylvia Reyna Ramirez as the dependent administrator for the Estate of Alfonso Lopez (Appellees) against the Texas Department of Transportation (TxDOT).[1] Pursuant to liability limitations under the Texas Tort Claims Act, the trial court remitted the award to a total of $500,000.00 in its final judgment against TxDOT.[2]

On appeal, TxDOT argues that the trial court did not have jurisdiction because it did not receive adequate written notice of the claim as required by the Texas Tort Claims Act. TxDOT also prays that the judgment be reversed and a take-nothing judgment rendered because there was no evidence to support several elements of the Appellees' claims and because they failed to obtain necessary jury findings. Because we conclude that TxDOT had adequate notice of the claims and is not entitled to a take-nothing judgment, we affirm the trial court's judgment.

## (1)   Factual and Procedural Background

On May 8, 2016, Alfonso Lopez was driving with passengers Garcia; Garcia's wife, Padron; their son, A.L.; and Lopez's girlfriend, Aguirre, on the 15900 block of Highway 290 between Elgin and Manor, Texas (Lopez accident site), when his truck hydroplaned and crashed. All were injured, and Garcia and Alfonso died. Padron and Aguirre sued, alleging that the road

---

[1]Originally appealed to the Third Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We follow the precedent of the Third Court of Appeals in deciding this case. *See* TEX. R. APP. P. 41.3.

[2]*See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.023.

condition "was so worn and slick" that it posed an unreasonable risk of harm, that TxDOT had actual knowledge of the highway's dangerous condition given that "there [had] been at least four prior fatalities on this stretch of Highway 290 since October 2015," and that TxDOT failed to use ordinary care to make the premises safe.[3] Ramirez intervened in the lawsuit.

At trial, Ryan Phipps, the chief of the Manor Police Department, testified that he "noticed that there [were] quite a few collisions . . . where vehicles just simply driving down the road would slide off either into the median or slide off the side of the roadway." According to Phipps, while many of the collisions reported to emergency dispatchers did not result in a crash report or investigation due to minor damage, "a few" resulted in injury and fatalities. On one occasion, Phipps recalled witnessing "multiple cars slid[ing] off the roadway while . . . dealing with the original scene [he was] called out for." That event prompted Phipps to email Robert Guydosh, a traffic signal engineer for TxDOT, to inform him of the issue.

Phipps' May 18, 2015, email provided the first notice to TxDOT about issues with the roadway and stated,

> We seem to be noticing a pattern in an area of [Highway] 290 here in Manor that we have had a large number of accidents in the last couple months. Most of them dealing with commercial motor vehicles and personal vehicles towing a trailer but they seem to be hitting a slick spot in the same stretch and jack-knifing and going off the roadway. If you drive out 290 starting in about the 14000 block you can see all of the skid marks and ruts of the roadway into the medians and unimproved shoulder areas. Not sure if this is something you guys want to look into but our local newspaper is already asking questions about it.

Guydosh confirmed that the area at issue was both eastbound and westbound on Highway 290 "a bit to the west of Old Kimbro Road" and that he had reported the issue to the maintenance

---

[3]Claims were also brought against Ford Motor Company, but they were dismissed before trial.

3

supervisor for the area who was "going to check" on it. Guydosh testified that he followed up with the TxDOT maintenance office and spoke with James Henderson, a TxDOT maintenance supervisor.

Phipps testified that most accidents occurred "[i]n that area a mile east and a mile west of FM 1100" and that the issues with the road were obvious to anyone who drove it. Photographs of the rutting and skid marks showing that many vehicles had slid off that portion of the roadway were introduced to the jury. Phipps testified that, "[o]ver some time," TxDOT "grated" a portion of the roadway in response, but that did not "completely fix[]" the problem.

In October 2015, Phipps responded to an accident that caused the death of Carol Voutsinas and led to TxDOT's second notice of an issue with the roadway. Specifically, Will Bozeman, a TxDOT engineering technician, testified that he alerted TxDOT supervisors that there was a problem with the portion of the roadway one mile east and one mile west from FM 1100 (the "problem area") after the Voutsinas accident, which was within one mile of the Lopez accident site. Bozeman concluded that "wet weather pavement" was a contributing factor in Voutsinas' accident.

Henderson testified that TxDOT received all police reports for accidents occurring in the problem area, and Bozeman testified that TxDOT maintained a crash records information system compiling the police officer crash reports. A search of this system for the one mile east and one mile west of FM 1100 showed there were a total of 117 crashes from 2010 through 2016. Excluding dry weather accidents, the system showed one wet weather accident from 2010 to 2012, three wet weather accidents in 2013 and 2014, twelve wet weather accidents in 2015, fifteen wet

4

weather accidents in 2016, and one standing water accident. The accident report listed Lopez's failure to control speed as a contributing factor in the accident.[4] Although there was no code for an officer to list road conditions as a contributing factor, the report contained a narrative section, which failed to mention they played any role in the accident. Bozeman testified that none of the 117 crash reports listed factors other than driver error.

In February 2016, Phipps received an open records request for crash data and reports for the problem area and sought the assistance of TxDOT in responding to the request. On February 4, Bozeman copied Phipps on a response sent to David Barol, Guydosh, and other TxDOT employees instructing them how to respond to the open records request for the "recent severe crashes" in the area "along US 290 (14800 Block) . . . cover[ing] an approx. 2.0 mi. segment, extending 1 mi. east & west of FM 1100, including the Old Kimbro, FM 1100 & Volker [sic] Ln. Intersections." In his response to Bozeman's email, Phipps informed TxDOT, "[T]his very small section of 290 provides a lot of work for our officers. Our local media has dubbed it the Bermuda Triangle of Manor." Phipps also wrote,

> You can drive out there right now and see the multiple skid marks in the median from many roll over collisions we have there, one or two which were fatal. I just wanted to bring this to TxDOT['s] attention because a layman looking at this would say there is an issue with the roadway and the number of serious accidents in the small area can't just be a coincidence.

Phipps testified that his intent in sending that email, constituting TxDOT's third notice of problems with the roadway "was just to get it fixed so we would stop having accidents out there."

---

[4]The speed limit was sixty-five miles per hour.

Bozeman also sent a separate, February 4 email only to TxDOT employees, including Bobby Ramthun, the TxDOT area engineer responsible for the section of road at issue at the time of the Lopez accident. In that email, he notified TxDOT supervisors and employees, including Imelda Barrett, the director of transportation operations, that he had had a conversation in December 2015 with John Peters, assistant area engineer, and advised Peters "of the serious wet pavement crash history that was [evident] from data analysis." According to Bozeman, Peters "responded that it matched up with conditions that Area Office and district pavement staff had already identified and were moving forward to address." As a result of the email chain, Guydosh admitted TxDOT was aware of the problem area, which was a straight and flat portion of roadway.

Bozeman testified that TxDOT decided to mill the road in the problem area after the Voutsinas accident, which, according to Bozeman, Ramthun, and Henderson, would create more friction and increase traction to make the road safer. According to Bozeman, Peters knew that there was an issue with the roadway in close proximity to the location of the Lopez accident site, told him that "follow-up work was in process," and said that he was working to mill the road "as fast as possible." Yet, at the time of trial, Bozeman could not testify whether the road at the Lopez accident site had been milled.

Ramthun testified that Peters was his supervisor when he started his position with TxDOT in January 2016, but that Peters did not communicate any wet weather pavement issues requiring milling of the road, and that he was not aware of any preventative maintenance contracts for the problem area. Henderson, who was supposed to report to Ramthun, also testified that he did not discuss any issues with the problem area with Ramthun. Yet, Henderson sent a request to schedule

6

use of the milling machine in January 2016 via email that said, "[T]hey are still having wrecks at those two locations on U.S. 290 near the 1100 Abramson Road. They want me to mill the entire roadway main lanes and shoulders." The TxDOT milling scheduler responded that the machine was being serviced and that they were "[h]oping to get [it] back soon." Ramthun clarified that, even after the February emails, nothing was done with the road at the Lopez accident site.

The evidence showed that the Lopez accident site was in the problem area. During cross-examination, Phipps said that the Lopez accident happened less than a mile away from the rutting and skid marks shown in the photograph to the jury, but that, in his opinion, the Lopez accident occurred "right around" the general area of concern. During redirect examination, Phipps unequivocally stated that the Lopez accident occurred "[i]n that area a mile east and a mile west of FM 1100." Also, Bozeman testified that the Lopez accident site was 0.75 miles east of FM 1100, and Henderson confirmed it was "within a mile of FM 1100 between Voelker and Abramson."

When Henderson investigated the Lopez accident, he concluded that it occurred "during rain/wet pavement." Photos of the roadway after the accident were taken by Henderson and shown to the jury. Some of the photos established that, while a portion of the problem area had been textured, the Lopez accident site was not textured. Ramthun confirmed that, based on a review of those pictures, the problem area around the Lopez accident site had not been recently milled and that TxDOT could have milled the entire portion of the problem area in one week or could have completed an asphalt overlay in several weeks. Henderson agreed that the problem area around the Lopez accident site was not milled and had a flush condition that could be very slippery when

7

wet. Yet, Henderson, Guydosh, and Ramthun testified that there were no signs notifying drivers to slow down or that the road was slippery when wet.[5] Accordingly, Henderson admitted that Lopez was not aware of the dangerous condition of the road.

According to Bozeman and Henderson, the pavement on the problem area was sealcoat, not asphalt. While Henderson did not know when the road was last treated with an asphalt overlay, Ramthun testified that the road was last chipsealed sometime between 2013 and 2015. Due to the condition of the road, Henderson testified that, after the Lopez accident, TxDOT displayed a sign in the problem area warning drivers to slow down during wet weather and milled the road a few weeks after the Lopez accident. Ramthun reported that, after the Lopez accident, TxDOT decided to repair the problem area with an asphalt overlay in 2017.

James Raymond Lock, an expert in traffic accident reconstruction, testified that, when he went to the scene of the Lopez accident thirty-seven days after the crash to investigate what contributing factors caused the accident, "TxDOT had already come through and ground up the road and destroyed the surface that was on it at the time of the crash." Lock spoke to witnesses and inspected Lopez's truck, tire marks left on and off the roadway, photographs and video from the accident scene, the police report, and eighteen similar crash reports in the problem area before forming his expert opinions. According to Lock, an examination of this evidence revealed that (1) the Manor Police Department admitted that they did not measure Lopez's speed at the time of the accident; (2) Lopez was travelling only between fifty and fifty-eight miles per hour at the time of

---

[5]Guydosh testified that caution signs could be placed by TxDOT. The signage, or lack thereof, did not form the basis of Appellees' premises defect claim.

the accident, which was a safe speed at the time of the accident;[6] (3) the worn, flushed, and polished condition of the "very hazardous" roadway, caused by "compaction" from "all the truck traffic pushing the rocks into the asphalt," constituted an unreasonably dangerous condition;[7] (4) the Lopez accident was proximately caused by the road surface because, "when wet[, it] had inadequate friction for the normal use and for a normal, reasonable, prudent driver to safely traverse it"; and (5) Lopez did not apply his brakes before or during the accident.

Jeffrey Milburn, a registered professional engineer and accident reconstructionist, testified that the police report was mistaken about the location of the accident and that the pavement did not cause the accident. According to Milburn, "[t]he crash report reported it two-tenths of a mile to the east of Abrahamson [sic]," but the Lopez accident site was "two-tenths of a mile to the west

---

[6]Padron and A.L. also testified that Lopez was driving safely and did nothing to cause the accident.

[7]Lock explained,

> A flushed pavement is one that the asphalt is fairly smooth and that the rocks that are on the asphalt, all the little aggregate pieces, are pushed into the asphalt and so, you don't have all the rocks protruding. You know, when you drive on roads that have kind of a fresh seal coat and the rocks are protruding, your tires make a lot of noise and then you hit a section where the wheel paths where the tires go, they are kind of black and then it just gets kind of quiet. That's because all of those rocks have been compressed down in the roadway from traffic. The more truck traffic that particular roadway has, the more that's going to happen; and so, it needs more maintenance. . . . Polished is a little bit different. It's sometimes used interchangeably, but it's not always the same. Polished means all those little bitty rocks that are in the roadway -- you know, you have the asphalt and it's binding, you know, all these rocks and that's really what you're riding on. But as you run over those rocks, especially if they are limestone or something that' s rather soft, they will start to round off and lose their little peaks and points on them -- a microtexture is what they call it because it's a really small texture. So, those rocks will polish down and if you've ever been out to some of the rivers we have out in west Texas, you see this rock we call rounded river gravel where the rocks are polished and they are really nice, kind of rounded rocks that are smooth and those are polished from the water currents and from tumbling. But the same thing can happen from truck tires and car tires going over those rocks. They will polish those rocks; and if you have polished rocks, you lose texture. You can still have some macrotexture where they stick up above the pavement but if they get compressed in the roadway, then most of your texture is gone, at least, in the wheel path. And you can always compare the wheel paths to like the center of the road and on both sides of the car there to see the difference.

9

of Abrahamson [sic]." Milburn testified that a sealcoat was placed on the highway in 2013, that the quality of the limestone aggregate was high and did not polish quickly, and that there was "still friction capability on that roadway." Milburn also said that flushing was a very common condition, but that that roadway only had, "at worst, very minor flushing."

According to Milburn, photos of the tire marks on the road indicated that Lopez did not lose control as a result of low friction on the road because "you can't make tire marks without friction." He explained,

> [I]f you look at the shape of that tire mark, it's a constant radius. That is, it doesn't go and then jig or jag, okay. It's a nice, smooth line. If this were a low friction loss of control, what you would see is when you come across the higher texture surface here in the middle, the tire mark would look different than it did across the wheel path where there is less prominent aggregate.

Milburn testified that, in his opinion, while the tires on the truck had good tread, Lopez lost control after a steering input quickly to the left lane caused "overcontrol." Milburn also said that there was no recent crash history near the Lopez accident site.

During cross-examination, Milburn agreed that he did not measure any tire marks at the site of the accident, did not inspect Lopez's truck, did not calculate Lopez's speed at the time of the accident, and did not speak with any TxDOT employees. He admitted that there was no measurement of the coefficient of friction or traction at the Lopez accident site, new pavement would have provided better traction, and flush pavement could contribute to wet weather accidents. Milburn also testified that he did not know exactly when or why the "steering event" occurred.

After the evidence was concluded, the jury was asked whether TxDOT's negligence proximately caused the occurrence. The jury charge read,

10

With respect to the condition of the premises, Defendant the Texas Department of Transportation was negligent if --

a.      the condition of the road at the time and place of the accident posed an unreasonable risk of harm, and

b.      the Texas Department of Transportation had actual knowledge of the danger, and

c.      Alfonso Lopez did not have actual knowledge of the danger, and

d.      the Texas Department of Transportation failed to exercise ordinary care to protect the occupants of the vehicle from the danger, by both failing to adequately warn them of the condition, if any, and failing to make that condition reasonably safe.

The jury answered affirmatively and declined to find that Lopez was proportionately responsible.

*(2)     TxDOT Received Timely, Adequate Notice of All Claims*

"The Texas Tort Claims Act [(TTCA)] waives immunity for certain tort claims, including premises defects, 'to the extent of liability' under the Act." *Worsdale v. City of Killeen*, 578 S.W.3d 57, 62 (Tex. 2019) (quoting TEX. CIV. PRAC. & REM. CODE ANN. § 101.022). However, the TTCA contains "a jurisdictional prerequisite to suit," found in Section 101.101, which reads:

(a)     A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:

(1)     the damage or injury claimed;
(2)     the time and place of the incident; and
(3)     the incident.

. . . .

(c)     The notice requirements provided or ratified and approved by Subsections (a) and (b) do not apply if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged.

11

*Id.*; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 101.101. Under Section 101.101(a), unless a government entity has actual knowledge under subsection (c), "a party seeking to impose liability must provide a governmental entity formal, written notice [complying with subsection (a)] not later than six months after the day the incident giving rise to the claim occurred." *Concho Cty. v. Gough*, No. 03-11-00164-CV, 2011 WL 6118577, at *2 (Tex. App.—Austin Dec. 9, 2011, no pet.) (mem. op.).

Corey Smythe, a claims representative for TxDOT's Occupational Safety Division, testified that at the relevant time, he received potential claims against TxDOT for personal injury or death and accepted or denied them. Approximately five weeks after the accident, on June 15, 2016, TxDOT was sent written notice "in accordance with . . . § 101.101," which stated that death and injury had occurred and described the date, location, and time of the accident. The letter, also addressed to Smythe, said it was "intended to act as notice [of] Ms. Padron's claims, which include those for the loss of her husband, Jose, her son Alfonso Lopez, herself and her minor son [A.L.]." The letter attached the police report for the accident showing that Lopez had hydroplaned and concluded with a statement by Padron's counsel that he "look[ed] forward to working with [TxDOT] on this claim."

Smythe responded to the letter acknowledging his receipt of the letter and informed Padron's counsel that TxDOT was going to investigate the accident. On November 6, 2016, Smythe informed Padron,

> Our investigation of the accident which made the basis for your client's claim has been completed and reviewed by the attorney general's office. It is their judgment that the Texas Department of Transportation committed no act of negligence that

12

was the proximate cause for this accident. We, therefore, must deny responsibility for liability.

TxDOT argues that the June 15 notice was insufficient because it did not expressly state TxDOT was at fault or how any action or inaction on its part caused the Lopez accident.[8] Even assuming the notice insufficient, there is nothing in the language of the statute that "require[s] that notice be given before filing suit. It requires instead that the government obtain notice within six months of the incident." *Colquitt v. Brazoria Cty.*, 324 S.W.3d 539, 543 (Tex. 2010) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 101.101). For this reason, the Texas Supreme Court has held that a lawsuit served on the governmental unit within six months of the incident that contains all the requisite information constitutes proper notice under Section 101.101. *Id.* at 541.

Here, it is undisputed that the original petition met the requirements of Section 101.101(a) and informed TxDOT of the Appellees' claims. "Serving a lawsuit within the six-month notice period satisfies the Act's notice requirements by alerting the government of the need to investigate." *Id.* at 543. "In a suit against the state, citation must be served on the secretary of state." TEX. CIV. PRAC. & REM. CODE ANN. § 101.102(c). The citation and return of service shows that the lawsuit was served on TxDOT through the secretary of state on November 8, 2016. Because TxDOT was served within six months of the May 8, 2016, accident—albeit on the last day—it received the notice required by Section 101.101(a).

Moreover, the statute's "written notice requirements . . . do not apply if a governmental unit has actual notice." *City of San Antonio v. Tenorio*, 543 S.W.3d 772, 776 (Tex. 2018). "To have actual notice, a governmental unit must have the same knowledge it is entitled to receive

---

[8]The letter did not contain a notice of Aguirre's claims.

13

under the written notice provisions of the TTCA." *Id.* "A governmental unit has actual notice under the TTCA if it has subjective knowledge [of, *inter alia*,] . . . the governmental unit's fault that produced or contributed to the death, injury, or property damage." *Id.* "If a governmental unit investigates an accident, whether the information acquired through its investigation meets the actual notice requirements of the TTCA depends upon the particular facts of the case." *Id.*

The evidence demonstrated that TxDOT was aware of wet pavement issues in the problem area before the Lopez accident. The police report stated that Lopez had hydroplaned. Henderson investigated the Lopez accident and on May 17, 2016, noted that Lopez crashed "during rain/wet pavement into median." Smythe testified that he received the June notice, that TxDOT investigated the accident, and that he informed Padron that it was determined that TxDOT was not liable because it "committed no act of negligence that was the proximate cause for this accident."

Because we find that TxDOT had proper notice as required by Section 101.101, we overrule its first point of error.

*(3)  TxDOT Is Not Entitled to a Take-Nothing Judgment*

Next, TxDOT argues that it is entitled to a take-nothing judgment because there was no evidence (a) that any condition of the problem area posed an unreasonable risk of harm, (b) that TxDOT had actual knowledge of an unreasonably dangerous condition, and (c) that Lopez did not have actual knowledge of the dangerous condition. TxDOT also argues that a take-nothing judgment should be entered because Appellees failed to obtain jury findings on an essential element of their premises liability claim.

14

*a.*        *Standard of Review*

"Judgment without or against a jury verdict is proper at any course of the proceedings only when the law does not allow reasonable jurors to decide otherwise." *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). A no-evidence challenge to a jury verdict is the same as a legal sufficiency review. *Id.* "[T]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019) (quoting *Wilson*, 168 S.W.3d at 827). "We 'credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.'" *Id.* (quoting *Wilson*, 168 S.W.3d at 827). "It is the province of the jury to resolve conflicts in the evidence," but the jury must do so reasonably. *Id.* (quoting *Wilson*, 168 S.W.3d at 820). A no-evidence challenge will be sustained

> when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.

*Id.* (quoting *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016)).

As referenced above, the TTCA's waiver for premises defect cases is limited.[9]  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.022. "If a claim arises from a premise defect on a toll highway, road, or street, the governmental unit owes to the claimant only the duty that a private

---

[9]The waiver does not apply to a claim arising from "the failure of a governmental unit initially to place a traffic or road sign, signal, or warning device if the failure is a result of discretionary action of the governmental unit." TEX. PRAC. & REM. CODE ANN. § 101.060. This case did not involve such a claim, but was instead a claim that the condition of the road posed an unreasonably dangerous condition.

person owes to a licensee on private property."[10]  TEX. CIV. PRAC. & REM. CODE ANN. § 101.022(c); *see Tex. Dep't of Transp. v. Gutierrez*, 284 S.W.3d 848, 850 (Tex. 2009); *City of Killeen v. Cheney*, No. 03-18-00139-CV, 2018 WL 5832088, at *3 (Tex. App.—Austin Nov. 8, 2018, no pet.) (mem. op.).  "Under this duty, a landowner must not injure a licensee by willful, wanton, or grossly negligent conduct, and must use ordinary care to warn the licensee of, or make reasonably safe, an unreasonably dangerous condition of which the landowner has actual knowledge, and the licensee does not."  *Cheney*, 2018 WL 5832088, at *3 (citing *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002)); *see Tex. Dep't of Transp. v. Perches*, 388 S.W.3d 652, 656 (Tex. 2012).

Thus, to prevail on the premises-defect claim, Appellees had to show that TxDOT "failed to either (1) use ordinary care to warn [Lopez] of an unreasonably dangerous condition of which it was actually aware and [Lopez] was not, or (2) make the condition reasonably safe."  *See Cheney*, 2018 WL 5832088, at *6 (citing *Univ. of Tex. at Austin v. Hayes*, 327 S.W.3d 113, 117 (Tex. 2010)); *see Gutierrez*, 284 S.W.3d at 850 ("To establish TxDOT's liability for an ordinary premise defect, [plaintiff] was required to obtain findings that TxDOT had actual knowledge of the dangerous condition and that she did not.").  A review of the jury charge shows that Appellees submitted and obtained jury findings on these elements.

"Ordinary drivers should not expect to encounter unreasonably dangerous conditions on the road."  *Cheney*, 2018 WL 5832088, at *8 (citing *Brumfield v. Tex. Dep't of Transp.*, No. 02-13-00175-CV, 2014 WL 2462699, at *4 (Tex. App.—Fort Worth May 29, 2014, no pet.) (mem.

---

[10]It is undisputed that this case does not involve a special defect.

16

op.)). "A condition is an unreasonably dangerous condition if it presents an unreasonable risk of harm." *Id.* at \*6 (citing *Brinson Ford, Inc. v. Alger*, 228 S.W.3d 161, 163 (Tex. 2007); *Knorpp v. Hale*, 981 S.W.2d 469, 474 (Tex. App.—Texarkana 1998, no pet.) ("A dangerous condition is one which presents a substantial risk of injury when the property is used with due care in a manner in which it is reasonably foreseeable that it will be used.")). "A condition poses an unreasonable risk of harm for purposes of premises liability when there is a 'sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen.'" *Id.* (quoting *Cty. of Cameron*, 80 S.W.3d at 556).

However, "a condition is not unreasonably dangerous simply because it is not foolproof." *Id.* (citing *Brookshire Grocery Co. v. Taylor*, 222 S.W.3d 406, 408–10 (Tex. 2006)). Also, "the fact that materials deteriorate over time and may become dangerous does not itself create a dangerous condition." *City of Dallas v. Thompson*, 210 S.W.3d 601, 603 (Tex. 2006).

> b.    *There Was Evidence that the Condition of the Problem Area Was Unreasonably Dangerous*

In support of its argument that there was no evidence that the problem area was unreasonably dangerous, TxDOT cites *Texas Department of Transportation v. Martinez*, No. 04-04-00867-CV, 2006 WL 1406571 (Tex. App.—San Antonio May 24, 2006, pet. denied). In that case, Martinez was travelling in the rain at a safe speed on a highway when he felt the empty trailer he was pulling swaying from side to side. *Id.* at \*1. Martinez took his foot off the accelerator, downshifted, and attempted to move to the right onto the shoulder when he lost control of his vehicle and crashed into another vehicle, killing its driver. *Id.* The police report described the

17

accident as a "jackknife accident." *Id.* In his suit against TxDOT, Martinez alleged that the road posed an unreasonable risk of harm because it had a low and uneven friction coefficient. *Id.* at *2.

At trial, Martinez introduced evidence that a TxDOT employee had requested the use of a milling machine for the roadway approximately two months before the accident but that the road was not milled until after the accident. *Id.* at *3. Martinez's experts testified at the trial that the condition of the road, "the friction of it or lack thereof," caused the accident. *Id.* It was undisputed at trial that a coefficient of friction range between .25 and .55 was reasonable, and Martinez's experts testified that the coefficient of friction of the road at the time of the accident was within that range. *Id.* at *2 n.4, *4. However, the experts testified that the road was unreasonably dangerous that day because there were three other accidents occurring within a 1.7 mile stretch of the highway. *Id.*

In concluding that Martinez's evidence failed to demonstrate that there was an unreasonable risk of harm, the San Antonio Court of Appeals focused on the following factors: the undisputed evidence showed that the friction coefficient was within the safe range for both wet and dry weather, there was no evidence of an uneven coefficient of friction at the accident site, the photographs relied on by the experts were miles from the Martinez accident site and only showed "moderate" flushing, and there was no evidence that the other accidents occurring on the same day were the result of flushing or a low coefficient of friction. *Id.* at *6–8.

Apart from the claim that the flushed condition of the road created an unreasonably dangerous slippery condition, this case has little in common with *Martinez.* First, there was conclusive evidence in Martinez that the coefficient of friction value was within the safe range.

There is no such evidence here. Instead, the jury heard evidence of a spike in wet weather crash history before the Lopez accident in the problem area.[11] Phipps testified that, as a result of the numerous recent crashes, he informed TxDOT there could be issues with the pavement. Phipps notified TxDOT about the problem with the road "to get it fixed so [they] would stop having accidents out there." Bozeman alerted other TxDOT employees and supervisors after the Voutsinas accident that the local media had dubbed the stretch of road the Bermuda Triangle of Manor and acknowledged that the pavement in the problem area needed repair. According to Bozeman, TxDOT decided to mill the road in the problem area after the Voutsinas accident to create more friction and increase traction to make the road safer. He added that it would not be a good use of taxpayer dollars to repair a road that was not in need of repair.[12]

A TxDOT email before the Lopez accident provided an update on the "pavement issues," discussed "serious wet pavement crash history" constituting a "significant 'hot spot' of wet pavement crashes . . . in this segment," and contained evidence that the crash history in the problem area "matched up with conditions" that TxDOT employees "had already identified and were moving forward to address." Henderson sent a January 2016 email stating that TxDOT wanted

---

[11]TxDOT argues that the evidence of the many accidents within the problem area was not evidence of an unreasonably dangerous condition because the police reports attributed the cause of the accidents to driver error. This argument disregards the jury's role in weighing the evidence. The jury heard that the crash report forms did not contain a code for pavement issues and, based on Phipps' testimony and TxDOT's acknowledgments of wet weather pavement issues in the problem area, could have determined that officer coding did not automatically exclude the condition of the road as being a contributing factor in the accidents. Therefore, the crash report forms did not conclusively establish the lack of a premises defect.

[12]We agree that the milling of the road after the Lopez accident was not evidence that the road was unsafe at the time of the accident. However, the jury was free to decide that TxDOT's decision to mill the problem area after the Voutsinas accident constituted evidence that the road was unsafe at the time of the Lopez accident given the wet weather pavement crash history and TxDOT emails.

19

him to mill the problem area because "they [were] still having wrecks at those two locations on U.S. 290 near the 1100 Abramson Road." Yet, Henderson testified that the problem area around the Lopez accident site was not milled even though it had a flush condition that could be very slippery when wet.

Lock testified that the roadway was not only worn and flushed, but also polished. He explained that the condition of the roadway was unreasonably dangerous because "the road surface when wet had inadequate friction." He opined that the worn, flushed, and polished condition of the road proximately caused the Lopez accident and the Voutsinas accident, which he also investigated. Lock's testimony constituted more than a scintilla of evidence of an unreasonably dangerous condition. However, TxDOT argues that Lock's opinion was conclusory because he was unable to measure the coefficient of friction since TxDOT milled the problem area after the Lopez accident.

"[O]pinion testimony that is conclusory or speculative is not relevant evidence, because it does not tend to make the existence of a material fact 'more probable or less probable.'" *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839 (Tex. 2010) (quoting *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004)). "[S]uch conclusory statements cannot support a judgment even when no objection was made to the statements at trial." *Id.* (quoting *Coastal Transp.*, 136 S.W.3d at 232). It is true that Lock was unable to measure the coefficient of friction since TxDOT paved the Lopez accident site soon after the crash. However, we do not find Lock's testimony conclusory.

20

Lock, who discussed his qualifications and expertise in traffic accident reconstruction,[13] explained the basis of his opinion to the jury. He testified that he inspected the scene, examined the tracks in the dirt left by Lopez's vehicle, looked at photographs and video of the accident, and studied Lopez's truck. He then "used what's called a point cloud scanner, which is like a survey instrument" to position the evidence markers placed by the Manor Police Department in investigating the accident to "get the path of the vehicle" and recreate the accident based on the "different angles of scrape marks on the vehicle." Lock also reviewed eighteen instances of loss of control collisions in the problem area "in the rain with wet pavement where the vehicle is traveling straight down the road and it began to spin." Lock informed the jury that four "Ph.D engineers" and a statistician had peer reviewed his work in this case and detailed the accident reconstruction for the jury, which demonstrated that Lopez was not speeding and slid on the roadway through no fault of his own.

Photos of the roadway showing the condition of the Lopez accident site and Lock's expert testimony explaining why the appearance of the roadway led to his conclusion were before the jury. Lock explained that the photos taken by Henderson showed the wheel paths on the travel lanes and that, by using Google Earth to create a "timeline sequence" going back before the accident, he was able to see changes to the roadway over time revealing that the color of the road became darker and darker as the asphalt and tar were increasingly exposed. Lock, referring the jury to photographs as he testified, stated, "[Y]ou can actually see the wheel paths where the tire

---

[13]Lock had over twenty-seven years of experience in accident investigation and previously owned an accident reconstruction company that provided "training for police officers and engineers in accident reconstruction." Lock and his company were also hired by departments of transportation in other states for highway safety projects.

would run are compacted. You can see the aggregate on the road here and then you can see what looks like [sic] in the wheel path. And if you take that and get a little water on it and get some compaction and bring the vehicle's speed up to highway speed, it becomes a very hazardous roadway."

"Expert testimony is conclusory if the witness does not provide an explanation of or a factual basis for his opinions." *In re Commitment of Jurischk*, No. 03-18-00670-CV, 2019 WL 2308594, at *2 (Tex. App.—Austin May 31, 2019, no pet.) (mem. op.) (citing *Bustamante v. Ponte*, 529 S.W.3d 447, 462 (Tex. 2017)). Where an expert presents objective, evidence-based support for his conclusions and a reasoned judgment based on established research and techniques, the opinion is not conclusory. *See id.* at *5; *Geis v. Colina Del Rio, LP*, 362 S.W.3d 100, 114 (Tex. App.—San Antonio 2011, pet. denied); *State Farm Lloyds v. Hamilton*, 265 S.W.3d 725, 733 (Tex. App.—Dallas 2008, pet. dism'd); *Gonzalez v. Salinas*, No. 04-06-00266-CV, 2007 WL 2042758, at *3 (Tex. App.—San Antonio 2007, no pet.) (mem. op.). Here, because Lock offered the bases for his opinions, his testimony was not conclusory. *See Towers of Town Lake Condo. Ass'n, Inc. v. Rouhani*, 296 S.W.3d 290, 298 (Tex. App.—Austin 2009, pet. denied) (expert opinion that plaintiff's fall was caused by slippery poolside deck surface was not conclusory because it was based on an inspection of the pool deck, a review of material used to coat the deck surface, and the witness's expertise). Therefore, we consider it in deciding whether Appellees presented more than a scintilla of evidence of an unreasonably dangerous condition.

"In reviewing a no evidence point, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor."

*Strata Res. v. State*, 264 S.W.3d 832, 843 (Tex. App.—Austin 2008, no pet.) (citing *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285–86 (Tex. 1998)). "If there is more than a mere scintilla of evidence to support the finding, the evidence is legally sufficient, and we will overrule the issue." *Id.* (citing *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005)).

The jury heard evidence showing that the problem area was worn, flushed, and polished and that the condition of the roadway presented a substantial risk of injury in wet weather when used by vehicles travelling at highway speeds. There were numerous single-car accidents in the problem area, both unreported and reported, involving drivers slipping off the road in wet weather. The jury could also consider the color photos of the Lopez accident site in "determin[ing] the condition of the road posed an unreasonable risk of harm." *Tex. Dep't of Transp. v. Milton*, No. 05-16-00955-CV, 2018 WL 4042486, at *3 (Tex. App.—Dallas Aug. 24, 2018, pet. denied) (mem. op.). Viewing all of the evidence recited above in the light most favorable to the verdict, we conclude it legally sufficient for a rational jury to find that the worn, flushed, and polished condition of the problem area created a sufficient probability of a harmful event occurring and that a reasonably prudent person would have foreseen the harmful event. Accordingly, we find that there was more than a scintilla of evidence that the condition of the problem area was unreasonably dangerous.

    c.    *There Was Evidence that TxDOT Knew of the Unreasonably Dangerous Condition*

"To prove the actual-knowledge element of a viable premises-defect claim, the licensee must show that at the time of the incident, the landowner knew about the dangerous condition."

*City of Denton v. Paper*, 376 S.W.3d 762, 767 (Tex. 2012) (per curiam). "[T]he actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time." *Id.* (quoting *Reyes v. City of Laredo*, 335 S.W.3d 605, 608 (Tex. 2010) (per curiam)). "Awareness of a potential problem is not actual knowledge of an existing danger." *Id.* (quoting *Reyes*, 335 S.W.3d at 609).

TxDOT acknowledges that it "was aware of obvious conditions of the road, including that it looked worn, bled, flushed, polished, and rutted," but argues that there is no evidence of its knowledge of the unreasonably dangerous condition because "no accident had ever taken place at the site of the subject accident prior to" the Lopez accident and the prior crash reports all attributed driver error as the cause of the accidents. TxDOT cites several Texas Supreme Court cases in support. Each is distinguishable on the facts.

TxDOT first cites *Paper*. Paper sued after she fell off her bike as a result of a sunken area in the roadway that the City had recently excavated and repacked when installing a sewer tap. *Id.* at 764. Paper alleged that the City was actually aware of the sunken roadway because it failed to make adequate repairs after installing the sewer tap the week before her accident. *Id.* at 766. The City presented evidence showing that the sunken area was repacked, brought up to street level, and repaired after it sank slightly the next day. *Id.* at 767. The City provided evidence showing that, when it finally left the project, "the area of construction was level with the street and was not hazardous" and that it had received no complaints about the area until Paper's accident. *Id.* In holding that "Paper presented no evidence that the City actually knew a dangerous condition existed after completion of its work on Paper's street the week before her accident," the Texas

24

Supreme Court wrote, "The City arguably knew that the repaired area of the street might sink again but 'the actual knowledge required for liability is of the dangerous condition at the time of the accident, not merely of the possibility that a dangerous condition can develop over time.'" *Id.* (quoting *Reyes*, 335 S.W.3d at 608).

The second case cited by TxDOT is *City of Dallas v. Thompson*, 210 S.W.3d 601 (Tex. 2006). Thompson sued the City after she tripped on the lip of an improperly secured expansion-joint cover plate that was protruding from the floor in the lobby of Dallas Love Field airport. *Id.* at 602. The evidence showed that City employees walked the lobby daily, there were reports of people falling at that same spot three years earlier, and the City knew the cover plate could become loose and raise suddenly over time. *Id.* at 602–03. Thompson argued that "the fact that the coverplate could loosen and protrude over time made the coverplate itself, actually protruding or not, a dangerous condition" and claimed that "the City's knowledge of this periodic protrusion and the need for inspection and maintenance satisfied the requirement of actual knowledge." *Id.* In rejecting Thompson's argument, the Texas Supreme Court held that the reports of prior falls "were all far too remote to show that the City knew of a dangerous condition at the time Thompson fell" and, "without evidence showing how long the alleged protrusion had existed, the proximity of the [City] employees" in the lobby was no evidence of actual knowledge. *Id.* at 603–04.[14]

---

[14]TxDOT also cites *Reyes v. City of Laredo*. In *Reyes*, a concerned citizen called 9-1-1 to advise police that water in a nearby creek "was rising and that there was going to be a problem with cars getting swept away if something was not done." *Reyes*, 335 S.W.3d at 608. *Reyes* sued the city when her family van was swept away as a result of the flooding a few hours later. In finding that it did not have knowledge of the unreasonably dangerous condition, the Texas Supreme Court found that the citizen's call established only that the creek was rising, not that the city ever knew that the road Reyes was driving on at the time of the accident had actually flooded. *Id.* at 609. *Reyes* is distinguishable because the dangerous condition—the flooding—was not a static condition, but a naturally subsiding one. Here, the problematic worn, flushed, and polished condition of the road could only get worse with time, and as discussed below, there was evidence that TxDOT actually knew of this dangerous condition.

Here, Unlike in *Paper* and *Thompson*, Appellees presented evidence of actual knowledge in the form of TxDOT emails. Phipps alerted TxDOT to "a pattern" shown by "a large number of accidents" resulting from vehicles "hitting a slick spot in the same stretch and jack-knifing and going off the roadway." "In determining whether a premises owner has actual knowledge, 'courts generally consider whether the premises owner has received reports of prior injuries or reports of the potential danger presented by the condition.'" *City of Dallas v. Reed*, 258 S.W.3d 620, 622 (Tex. 2008) (quoting *The Univ. of Tex.-Pan Am. v. Aguilar*, 251 S.W.3d 511, 513 (Tex. 2008) (per curiam)); *see Tex. S. Univ. v. Gilford*, 277 S.W.3d 65, 70 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Although TxDOT argues that it was not aware that the Lopez accident site was unreasonably dangerous because no prior accidents occurred in that exact spot, TxDOT emails showed that its employees acknowledged that there was a "problem" with the entire portion of the problem area, which consisted of the roadway one mile east and one mile west from FM 1100 and included the Lopez accident site. There was more than a scintillia of evidence that the "problem" TxDOT was aware of was not just a potential problem, but an existing one. *See Tex. Dep't of Transp. v. Fontenot*, 151 S.W.3d 753, 763–64 (Tex. App.—Beaumont 2004, pet. denied).

This is demonstrated by the fact that the jury heard that Phipps first urged TxDOT to investigate approximately one year before the Lopez accident as a result of "a large number of accidents" being caused by motorists "hitting a slick spot" in the road. In October 2015, after the Voutsinas accident, Bozeman alerted TxDOT supervisors that there was a "problem" in the problem area and determined that the condition of the road, specifically "wet weather pavement," had contributed to Voutsinas's death. TxDOT received police reports showing the spike in wet

26

weather accidents as the accidents were being reported. The jury could have found that as of February 4, 2016, TxDOT emails showed that its employees believed road conditions were continuing to contribute to wet weather pavement accidents because they established TxDOT knew about "serious wet pavement crash history" that "matched up" with problematic road conditions TxDOT employees had already identified. Guydosh testified that TxDOT was aware as of the February 4, 2016, email of "the problem spots" identified by Phipps. On February 5, 2016, Phipps again wrote to TxDOT to do something about the "issue with the roadway and the number of serious accidents . . . [that] can't just be a coincidence." On the same day, a TxDOT employee acknowledged, "There [do] seem to be loss of control crashes near FM1100 where there was one fatal." TxDOT also knew that the problem area was being referred to as the Bermuda Triangle of Manor. Henderson testified that he "drove the road and checked out the scenario" before the Lopez accident. Based on its investigation, TxDOT decided to mill the problem area to create more friction and increase traction, including the Lopez accident site, which even Henderson agreed had a flush condition that could be very slippery when wet.

Unlike in *Paper* and *Thompson*, the emails, accident reports from several accidents introduced into evidence, photos of the roadway, and testimony from Phipps and TxDOT employees showed that prior accidents in the problem area were not too remote and that TxDOT was aware that worn and flushed road conditions in the problem area had contributed to the recent wet weather pavement accidents. Although TxDOT's investigation led to directives to mill the Lopez accident site in November or December 2015, the work was not completed before the May 2016 Lopez accident, even after the Voutsinas fatality.

27

From the evidence presented in this case, a rational jury could find that TxDOT had been made aware on multiple occasions of the unreasonably dangerous condition posed by the problem area, beginning one year before this accident; had traversed the problem area for the purposes of examining its condition; had determined that road conditions caused a death before the Lopez accident; and was well aware that the unreasonably dangerous condition had already developed but failed to act at the Lopez accident site. *See Milton*, 2018 WL 4042486, at *3. We find that, based on the evidence when viewed in a light most favorable to its verdict, the jury could reasonably infer TxDOT was actually aware that the worn, flushed, and polished condition of the road at the Lopez accident site was unreasonably dangerous at the time of the accident.[15]

d.    *There Was Evidence Lopez Did Not Have Actual Knowledge of the Condition*

"[T]o establish liability for a premises defect, a licensee must prove that he or she did not actually know of the condition." *Brown*, 80 S.W.3d at 558. TxDOT argues that there is no evidence that Lopez did not see the appearance of the road.[16] Therefore, TxDOT argues, there is no evidence that Lopez did not have actual knowledge of the dangerous condition of the road. The mere fact that Lopez saw the road in the rain while travelling at highway speed does not equate to his actual knowledge of the unreasonably dangerous condition in the problem area. "The relevant inquiry is whether the [unreasonably dangerous condition] was open and obvious to motorists

---

[15]TxDOT argues, "[E]mails referring to the roadway being flushed and worn, which would indicate that the road provided less friction than a brand-new road, is not evidence that the road provided friction so low that it posed an unreasonable risk of harm." This argument ignores the jury's role in weighing evidence of TxDOT's knowledge before the Lopez accident of the serious wet pavement crash history in the problem area, including the Voutsinas fatality.

[16]TxDOT argues that there was no evidence Lopez did not read local reports dubbing the problem area as the Bermuda Triangle of Manor. Because there was no evidence that Lopez saw those reports, TxDOT's argument does not aid our analysis.

entering the causeway, because that is the point at which they could choose to avoid the condition or otherwise protect themselves." *Id.* at 556.

It is undisputed that there were no warning signs in the problem area that would have provided Lopez with actual knowledge of the dangerous condition. The jury saw photos of the Lopez accident site and could have concluded the worn, flushed, and polished condition of the road would not be open and obvious to a motorist travelling at highway speeds. Even Henderson testified that Lopez would have "no way of knowing" that the road "could actually be pretty slippery." Padron and A.L. also testified that Lopez was driving safely and did nothing to cause the accident before his vehicle slid. The jury could infer that, had Lopez known of the dangerous condition, he would have attempted to avoid it.

We find that there was more than a scintilla of evidence showing that Lopez did not have actual knowledge of the unreasonably dangerous condition. We overrule this point of error.

*e.    Appellees Secured All Required Jury Findings*

The portion of the jury charge at issue read, "With respect to the condition of the premises, Defendant the Texas Department of Transportation was negligent if . . . the condition of the road at the time and place of the accident posed an unreasonable risk of harm." TxDOT's proposed jury instructions sought to narrow the inquiry by asking the jury only if "the amount of friction provided by the road surface at the time and place of the accident posed an unreasonable risk of harm." In its last point of error, TxDOT argues that Appellees failed to obtain required jury findings because the jury charge did not define the unreasonably dangerous condition.[17]

---

[17]TxDOT appears to suggest that Appellees were required to measure the coefficient of friction to sustain any jury finding in its favor even though TxDOT milled the road soon after the Lopez accident.

29

We have found nothing that required the trial court to limit the jury charge in the manner requested by TxDOT.[18]  In fact, the Texas Supreme Court has written,

[T]he proper instruction in a premises liability case when the plaintiff is a licensee is:

With respect to the condition of the premises, defendant was negligent if—

a.   the condition posed an unreasonable risk of harm;

b.   defendant had actual knowledge of the danger;

c.   plaintiff did not have actual knowledge of the danger; and

d.   defendant failed to exercise ordinary care to protect plaintiff from danger, by both failing to adequately warn plaintiff of the condition and failing to make that condition reasonably safe.

*State v. Williams*, 940 S.W.2d 583, 584 (Tex. 1996).  Pursuant to *Williams*, the trial court's jury charge tracked the language of the proper charge and contained all the required elements for a premises defect claim against TxDOT.

Because we find that Appellees secured all required jury findings, we overrule TxDOT's last point of error.

---

[18]The trial court's jury charge also tracked the language of the relevant Texas Pattern Jury Charge.  See Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges:  Malpractice, Premises & Products, PJC 66.5 (2018).  TxDOT points to a comment to the Texas Pattern Jury Charge, which states, "If it is agreed that the case involves only one condition, the Committee recommends that the particular condition (e.g., *a grape on the floor*) be substituted for the phrase "*the condition*." *Id.*  This does not show that the trial court was required to approve TxDOT's proposed instruction.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice


Date Submitted:     October 7, 2019
Date Decided:       December 13, 2019